**RIGRODSKY LAW, P.A.**
Gina M. Serra (#361172)
1091 N. Palm Canyon Drive, Suite 9
Palm Spring, CA 92262
Telephone: (760) 406-8009
Facsimile: (302) 654-7530
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACK PITTROF, Derivatively on Behalf of Nominal Defendant FORTINET, INC., | |
| Plaintiff, | Case No. _____ |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| KEN XIE, MICHAEL XIE, KENNETH A. GOLDMAN, MING HSIEH, JEAN HU, JANET NAPOLITANO, JUDITH SIM, JAMES STAVRIDIS, KEITH JENSEN, and CHRISTIANE OHLGART, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| FORTINET, INC., | |
| Nominal Defendant. | |

Plaintiff Jack Pittrof ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Fortinet, Inc. ("Fortinet" or the "Company"), against members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

transcripts and announcements made by Defendants, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Fortinet, legal filings, news reports, securities analysts' reports about the Company, filings in related actions, and other publicly available information.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Fortinet against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for violations of federal securities laws and breaches of their fiduciary duties between at least November 8, 2024 through the present (the "Relevant Period"), as set forth below.

2.      The Individual Defendants breached their fiduciary duties by allowing Defendants to cause, or by themselves causing, the Company to engage in making materially false and misleading statements, insider trading, and repurchasing of millions of shares of Fortinet's stock at artificially inflated prices, and caused Fortinet to incur substantial damage.

3.      Fortinet is a cyber security company.  Its most important product is its FortiGate firewalls.  The primary purpose of a firewall is to establish a barrier between a trusted internal network and untrusted external networks, such as the internet, to prevent unauthorized access and malicious activity.

4.      The Individual Defendants misrepresented the business impact and sustainability of a purportedly "record" round of unit upgrades consisting of approximately 650,000 FortiGate firewalls, or roughly one quarter of the Company's total FortiGate units.  During the Relevant Period, the Individual Defendants told investors that this "refresh cycle" was "by far the largest we've seen probably ever," would generate "around $400 million to $450 million in product

---

[1] The "Individual Defendants" are Ken Xie, Michael Xie, Kenneth A. Goldman ("Goldman"), Ming Hsieh ("Hsieh"), Jean Hu ("Hu"), Janet Napolitano ("Napolitano"), Judith Sim ("Sim"), James Stavridis ("Stavridis"), Keith Jensen ("Jensen"), and Christiane Ohlgart ("Ohlgart"). The Individual Defendants, together with Fortinet, are "Defendants."

revenue" in 2025 and 2026, and would create strong opportunities to cross-sell additional products and services.  The Individual Defendants also repeatedly represented that the refresh cycle would "gain momentum" in the second half of 2025 and beyond.

5.     In reality, the Individual Defendants knew that the refresh cycle would never be as lucrative as they represented, nor could it, because it consisted of old products that were a "small percentage" of the Company's business.  Moreover, the Individual Defendants misrepresented and concealed that they did not have a clear picture of the true number of FortiGate firewalls that could be upgraded.  Further, despite telling the public that the refresh would gain momentum over the course of two years, the Individual Defendants misrepresented and concealed that it had aggressively pushed through roughly half of the refresh in a period of just a few months, by the end of 2Q 2025.

6.     On August 6, 2025, after the markets closed, Defendants revealed during the Company's second quarter 2025 earnings call that Fortinet was already "approximately 40% to 50% of the way through the 2026 upgrade cycle at the end of the second quarter [of 2025]." During the call, an analyst asked, "why are we not seeing more upside in the numbers this year from the refresh cohort," given "that we are 40% to 50% through" "a really big or larger than normal refresh cohort?"  In response, Defendants: (i) admitted that "it's hard[] for us to predict" the total number of FortiGates requiring an upgrade; (ii) suggested customers had "excess [firewall] capacity from [purchasing firewalls in] prior years" and therefore did not need to upgrade; and (iii) revealed that the refresh could not have had "much business impact" as it consisted of only a "small percentage" of the Company's business because the products were "12 to 15 years" old and had been sold at a time when Fortinet's business was 5-10 times smaller, meaning that the total number of FortiGates eligible for an upgrade was inherently limited.

7.     On this news, the price of Fortinet common stock fell over 22%, from $96.58 per share on August 6, 2025, to $75.30 per share on August 7, 2025, on unusually high trading volume.

8.     As set forth herein, throughout the Relevant Period, the Individual Defendants

breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Individual Defendants knew that the refresh cycle would never be as lucrative as they represented, nor could it, because it consisted of old products that were a "small percentage" of the Company's business; (ii) the Individual Defendants did not have a clear picture of the true number of FortiGate firewalls that could be upgraded; (iii) the Individual Defendants had aggressively pushed through roughly half of the refresh in a period of months, by the end of 2Q 2025; (iv) the Company failed to maintain adequate internal controls; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.    Additionally, the Individual Defendants breached their fiduciary duties by causing Fortinet to repurchase its own stock at artificially inflated prices due to the materially false and misleading statements. Indeed, the Individual Defendants caused the Company to repurchase of at least 4.6 million shares of Company stock while they knew it was artificially inflated.

10.    As a result of the foregoing, a class action was filed against the Company and certain Individual Defendants in this Court captioned *Oklahoma Firefighters Pension and Retirement System v. Fortinet, Inc., et al*., Case No. 5:25-cv-08037 (N.D. Cal.) (the "Securities Class Action").

11.    Further, during the Relevant Period, while the Company's stock price was artificially inflated due to the false and misleading statements detailed herein, certain Individual Defendants sold Company stock while in possession of material, non-public Company information.

12.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and potentially paying class-wide damages in the Securities Class Action, as well as additional losses, including

1   reputational harm and loss of goodwill.

2       13.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants,

3   most of whom are the Company's current directors, their collective engagement in fraud, the

4   substantial likelihood of the directors' liability in this derivative action and Defendants' liability

5   in the Securities Class Action, their being beholden to each other, their longstanding business and

6   personal relationships with each other, and their not being disinterested and/or independent

7   directors, a majority of Fortinet's Board cannot consider a demand to commence litigation

8   against themselves and the other Individual Defendants on behalf of the Company with the

9   requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a

10  demand on the Board because, as further detailed herein, demand would be a futile and useless

11  act.

12                          **JURISDICTION AND VENUE**

13      14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and

14  Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted

15  herein for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange

16  Act") (15 U.S.C. § 78(j)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the

17  SEC, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

18      15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

19  to 28 U.S.C. § 1367(a).

20      16.    This action is not a collusive action designed to confer jurisdiction on a court of

21  the United States that it would not otherwise have.

22      17.    In connection with the acts, conduct and other wrongs complained of herein,

23  Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

24  the United States mail, and the facilities of a national securities market.

25      18.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and

26  28 U.S.C. § 1391 because a substantial portion of the acts and omissions alleged herein, including

27  the dissemination of materially false and misleading information, occurred in this District,

28                                    5

Fortinet is headquartered in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*__Plaintiff__*

19.    Plaintiff is, and has been at all relevant times, a continuous shareholder of Fortinet.

*__Nominal Defendant__*

20.    Nominal Defendant Fortinet is a Delaware corporation with its principal executive offices located in Sunnyvale, California.

*__Individual Defendants__*

*__Director Defendants__*

21.    Defendant Ken Xie has served as the Company's Chief Executive Officer and a member of the Board since October 2000. Ken Xie is a defendant in the Securities Class Action.

22.    Defendant Michael Xie has served as the Company's President and Chief Technology Officer since November 2013 and as a member of the Board since February 2001. Michael Xie is a member of the Cybersecurity Committee. Michael Xie is a defendant in the Securities Class Action.

23.    Defendant Goldman has served as a member of the Board since October 2020. Goldman is the Chair of the Audit Committee and a member of the Human Resources Committee.

24.    Defendant Hsieh has served as a member of the Board since April 2013. Hsieh is a member of the Audit Committee and Chair of the Governance and Social Responsibility Committee.

25.    Defendant Hu has served as a member of the Board since October 2019. Hu is a member of the Audit Committee and a member of the Cybersecurity Committee.

26.    Defendant Napolitano has served as a member of the Board since November 2024. Napolitano is a member of the Cybersecurity Committee and a member of the Human Resources Committee.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27.     Defendant Sim has served as a member of the Board since June 2015. Sim is Chair of the Human Resources Committee and a member of the Governance and Social Responsibility Committee.

28.     Defendant Stavridis has served as a member of the Board since October 2021. Stavridis is Chair of the Cybersecurity Committee and a member of the Governance and Social Responsibility Committee.

***Officer Defendants***

29.     Defendant Jensen served as Fortinet's Chief Financial Officer ("CFO") during the Relevant Period until May 15, 2025. Jensen is a defendant in the Securities Class Action.

30.     Defendant Ohlgart has served as Fortinet's CFO since May 15, 2025.  During the Relevant Period until May 15, 2025, she served as Fortinet's Chief Accounting Officer. Ohlgart is a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of Fortinet, and because of their ability to control the business and corporate affairs of Fortinet, the Individual Defendants owed Fortinet and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fortinet in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fortinet and its shareholders.

32.     Each director and officer of the Company owes to Fortinet and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fortinet, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.     To discharge their duties, the officers and directors of Fortinet were required to exercise reasonable and prudent supervision over the management, policies, controls, and

operations of the Company.

35.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Fortinet, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

37.     To discharge their duties, the officers and directors of Fortinet were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Fortinet were required to, among other things:

        (i)     not repurchase Company stock while it was artificially inflated;

        (ii)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States,

and pursuant to Fortinet's own Code of Business Conduct and Ethics (the "Code of Conduct");

(iii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iv)    Remain informed as to how Fortinet conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(v)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Fortinet and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(vi)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fortinet's operations would comply with all applicable laws and Fortinet's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vii)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(viii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(ix)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

38.    Each of the Individual Defendants further owed to Fortinet and the shareholders the duty of loyalty requiring that each favor Fortinet's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

39.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Fortinet and were at all times acting within the course and scope of such agency.

40.    Because of their advisory, executive, managerial, and directorial positions with Fortinet, each of the Individual Defendants had access to adverse, non-public information about the Company.

41.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fortinet.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

43.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

44.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

45.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions

described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Fortinet, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

47.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fortinet and at all times acted within the course and scope of such agency.

## FORTINET'S CODE OF CONDUCT

48.     Fortinet's Code of Conduct applies to all Company employees, officers, and directors.

49.     The Code of Conduct states that it is designed to promote "full, fair, accurate, timely and understandable disclosure in reports and documents we file with or submit to the U.S. Securities and Exchange Commission and in our other public communications."  The Code of Conduct also states that it is designed to promote "compliance with applicable laws, rules and regulations."

50.     The Code of Conduct states that: "You may not receive any improper benefit as a result of your position with Fortinet."

51.     The Code of Conduct provides: "Individuals involved in the preparation of public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications." The Code of Conduct continues: "If you believe that any disclosure is materially misleading or if you become aware of any material

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of the Legal Department. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board of Directors."

52.     Moreover, the Code of Conduct states: "As a public company, we are required to follow strict accounting principles and standards, to report financial information accurately and completely in accordance with these principles and standards, and to have appropriate internal controls and procedures to ensure that our accounting and financial reporting complies with the law. The integrity of our financial transactions and records is critical to the operation of our business and is a key factor in maintaining the confidence and trust of our employees, security holders and other stakeholders."

53.     The Code of Conduct goes on to state: "It is important that all transactions are properly recorded, classified and summarized in our financial statements, books and records in accordance with our policies, controls and procedures, as well as all generally accepted accounting principles, standards, laws, rules and regulations for accounting and financial reporting."

54.     The Code of Conduct further provides: "False, misleading or incomplete information undermines Fortinet's ability to make good decisions about resources, employees and programs and may, in some cases, result in violations of law. Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must be diligent in assuring that those records and reports are complete, accurate and timely. Anyone representing or certifying as to the accuracy of such records and reports should make an inquiry or review sufficiently adequate to establish a good faith belief in their accuracy."

55.     The Code of Conduct states: "You may not intentionally misrepresent Fortinet's financial performance or otherwise intentionally compromise the integrity of Fortinet's reports, records, policies and procedures."

56.     According to the Code of Conduct, "The Audit Committee plays an important role

in ensuring the integrity of our public reports. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board of Directors."

57.   The Code of Conduct also provides: "Under securities and other laws, it is unlawful for any person who has "material" nonpublic information about a company to trade in the stock or other securities of that company or to disclose such information to others who may trade. Material nonpublic information is information about a company that is not known to the general public and that a typical investor would consider important in making a decision to buy, sell or hold securities. Violations of securities laws may result in civil and criminal penalties, including disgorgement of profits, civil judgments, fines and jail sentences."

## **FORTINET'S AUDIT COMMITTEE CHARTER**

58.   Pursuant to Fortinet's Audit Committee Charter, the purpose of the Audit Committee is to:

> provide oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements;

> assist the Board in oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the internal audit function, (4) the independent auditor's qualifications, independence and performance, and (5) the Company's internal accounting and financial controls; and

> provide to the Board such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

59.   Pursuant to Fortinet's Audit Committee Charter, the Audit Committee has the following responsibilities, among others:

> Review Procedures. The Audit Committee shall review and discuss the following with management and the independent auditor, as applicable:

> the Company's annual audited and quarterly unaudited financial statements, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations";

> the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the annual financial statements;

the reports and certifications regarding internal controls over financial reporting and disclosure controls;

major issues regarding accounting principles and financial statement presentations;

analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements; and

any problems or difficulties the independent auditor encountered in the course of its audit work.

Internal Controls. The Audit Committee shall review and discuss with management and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor and any special audit steps adopted in light of significant control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

Legal and Regulatory Compliance. The Audit Committee shall review and discuss with management the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Ethics and Conduct, compliance with the Foreign Corrupt Practices Act, and compliance with export control regulations.

Internal Audit. The Audit Committee shall review the appointment, qualifications and performance of the Company's internal audit function. Such review would include approval of the annual audit plan and resources necessary to carry out that plan. The Audit Committee will review the reporting structure of the audit function including its independence from management.

Complaints. The Audit Committee shall oversee procedures established for the receipt, retention and treatment of complaints on accounting, internal accounting controls or audit matters, as well as for confidential and anonymous submissions by the Company's employees concerning questionable accounting or auditing matters.

Risks. The Audit Committee shall review and discuss with management, internal audit and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management.

Related Party Transactions. The Audit Committee shall review all transactions between the Company and a related person for which review or oversight is required by applicable law or that are required to be disclosed in the Company's financial statements or SEC filings.

Cybersecurity Risk Management. Review with management the Company's cybersecurity and other information technology risks, controls and procedures, including the Company's plans to mitigate cybersecurity risks and respond to data

breaches.

**FORTINET'S CYBERSECURITY COMMITTEE CHARTER**

60.     Pursuant to Fortinet's Cybersecurity Committee Charter, the purpose of the Cybersecurity Committee is to:

Provide oversight of the Company's information security, product security and data privacy programs, including the applicable assets, products, services, personnel, facilities, information systems, intellectual property, data and other digital assets;

Review and provide oversight on controls, policies and procedures of the Company put in place for monitoring, preventing and responding to cybersecurity, product cybersecurity and data privacy risks;

Review the Company's cybersecurity, product security and data privacy and other information technology risks, controls and procedures, including the Company's plans to mitigate cybersecurity risks and respond to data breaches;

Review and provide oversight over the Company's compliance with laws and regulations applicable to the above-mentioned functions, including incident notification processes and requirements; and

Review and provide oversight over the Company's information security, product security and data privacy compliance and standard and certifications programs to support growth across all sectors.

61.     Pursuant to Fortinet's Cybersecurity Committee Charter, the Cybersecurity Committee has the following responsibilities, among others:

Review with management the Company's risk management, information security, product security, cybersecurity and data privacy controls, policies and procedures, evaluate the integrity of such controls, policies and procedures, compare them against industry benchmarks and best practices, and assess risks related to physical security and cybersecurity threats in light of such controls, policies and procedures and the current cybersecurity threat landscape.

Review with management legislative and regulatory developments that could impact the Company's physical security and cybersecurity risk and product security exposure.

Review and provide oversight on planning, development and maintenance of the controls, policies and procedures of the Company in preparation of or responding to any physical security, cybersecurity, product security and data privacy incident, and review with management any major physical security, cybersecurity, product security and data privacy incidents that may occur.

Discuss with management the safeguards used to protect the confidentiality, integrity, availability, and safety of the Company's assets, products, services, personnel, facilities, information systems, intellectual property and data, and the

strategies for investing in the Review and discuss with management the Company's disclosures, if any, relating to the Company's safeguarding and cybersecurity of its assets, products, services, personnel, facilities, information systems and data, including disclosure on the Company's website and its reports filed with the Securities and Exchange Commission.

Review and reassess the adequacy of this Charter periodically and recommend any proposed changes to the Board for approval.

Report regularly to the Board (i) following meetings of the Cybersecurity Committee, (ii) with respect to such other matters as are relevant to the Cybersecurity Committee's discharge of its responsibilities and (iii) with respect to such recommendations as the Cybersecurity Committee may deem appropriate. The report to the Board may take the form of an oral report by the chairperson or any other member of the Cybersecurity Committee designated by the Cybersecurity Committee to make such report. If all Board members attend the Cybersecurity Committee meeting, then the Cybersecurity Committee shall not be obligated to report again the same information to the Board except as required for recommendations needed for Board approval.

Review and provide oversight over the Company's Insider Threat Program ("Threat Program"), including active investigations and continuous program improvement efforts to ensure the Threat Program meets and exceeds industry best practices.

Review and provide oversight over the Company's use of Artificial Intelligence internally and in its products.

## SUBSTANTIVE ALLEGATIONS

*Background*

62.    Fortinet is a cybersecurity company best known for its FortiGate firewalls. The Company has two main revenue streams: product revenue and service revenue. Product revenue currently accounts for roughly 30-35% of Fortinet's total revenue and includes the sale of hardware like FortiGates and software licenses. Service revenue accounts for roughly 65-70% of the Company's revenue and includes the sale of subscriptions for intrusion prevention and antivirus protection, technical support, and cloud services.

63.    Fortinet sells its FortiGate firewalls bundled with software and support services. The firewalls themselves have a limited support life cycle of roughly ten years depending on the model. After the life cycle ends, the Company stops providing firmware updates and security patches, and hardware support from Fortinet expires. This is referred to as "end-of-support" or "end of service" ("EOS"). When hardware approaches EOS, customers are prompted by the

1  company to "refresh" their hardware with newer models.

2      64.    Periodically, large swaths of older FortiGate models reach EOS at the same time

3  and require a refresh.  Fortinet calls this a "refresh cycle."  Refresh cycles typically boost

4  Fortinet's product revenue for a time as customers purchase new hardware.  A refresh cycle also

5  typically leads to an increase in service revenue, because customers often renew or expand their

6  subscriptions when upgrading their hardware.

7      65.    During the COVID-19 pandemic, many companies shifted employees to remote

8  work which caused a surge in demand for Fortinet's products.  Moving employees to remote work

9  meant that companies had to secure all the new remote connections to their networks which often

10  meant buying more or better firewalls.  Fortinet experienced strong product revenue growth from

11  2020 through 2022 during the COVID-19 pandemic.

12      66.    In 2023 and the first half of 2024, Fortinet's product revenue growth slowed for

13  several reasons, including that many customers who upgraded during the pandemic did not need

14  new firewalls and that macroeconomic concerns caused many companies to cut their IT spending.

15      67.    Beginning in the second half of 2024, the Company began to tell investors that it

16  was seeing signs of recovery in the firewall market and that it expected the next refresh cycle to

17  begin in 2025.  For instance, during Fortinet's August 6, 2024 2Q 2024 earnings conference call,

18  Defendant Jensen said the Company was seeing "signs of possible improvement in the firewall

19  market" including that "days of registered security service contracts improved . . . and has now

20  returned to 2020 pre-supply chain, pre-COVID crisis levels" and noted that "the sequential

21  increase in hardware sales in the second quarter aligned more closely with historical norms."  He

22  added that a "full refresh" was on the horizon, "likely in 2025."

23  ***Materially False and Misleading Statements***

24      68.    On November 7, 2024, after market hours, Fortinet held an earnings call to discuss

25  the Company's 3Q 2024 financial results.  During the call, Defendant Jensen discussed the

26  FortiGate refresh opportunity in his prepared remarks.  He stated:

27

28

I'd like to offer a couple of comments on the firewall recovery and refresh opportunity. During last quarter's remarks, we mentioned that the continued improvement in the days of registered FortiGuard contracts indicated the inventory digestion at end users was returning or had returned to normal.

In the third quarter, this metric was stable, further validating our view that the firewall market is recovering. Today, we'd like to add to this commentary by noting that in 2026, a record number of FortiGates will reach the end of their support life cycle, and we expect these customers to start to refresh cycle for these products sometime in 2025.

69.    Later during the call, a JP Morgan analyst asked:

[C]ould you dig into the commentary around the firewall refresh cycle that you provided? So with respect to conversations you're having with customers, and maybe with a little bit of color what you've seen historically, how far before the renewal point do customers tend to refresh? And do you have any insight into the mix of [types of customers]? And what the timing and the magnitude might be, whether this might be a first-half event, second-half event? Any kind of insight you could provide would really be helpful.

70.    In response, Defendant Jensen indicated certain larger customers would start to methodically upgrade in 2025 and touted the size of the refresh, particularly as compared to its 2023 refresh cycle:

I think that we see these end-of-life of these products starting in the second half of 2026. We don't expect the customers to wait until the 11[th] hour to make the change. For larger enterprises, they would go through another certification, [proof of concept] project perhaps as part of that before they place them in service.

So we saw a similar -- not similar, we saw a lift, if you will, similarly in 2023, although the magnitude in 2026 is much, much larger. And why it's relevant to 2023 is that if you go back and look at product revenue growth in 2022, very different world, supply chain, switches, et cetera. But I think in 2022, the product revenue growth was a little bit over 40%. So we do think there's a relationship there. We do think it starts earlier.

To the second part of your comment, as I mentioned, the absolute number that we see in 2026 is by far the largest we've seen probably ever, but certainly in the last five or six years. It is -- each year is dominated by the entry-level firewalls. However, in 2026, we do see a significant portion of that actually being in the mid-range firewalls as well, and that is a very unusual and positive situation.

71.    On November 18, 2024, Fortinet held an "Analyst Day" conference and provided details about the "record" refresh cycle. In conjunction with the Analyst Day, Fortinet published a presentation titled "2024 Analyst Day." The presentation included a slide that indicated the

refresh included nearly 700,000 FortiGate units, which accounted for one-fourth of the Company's total FortiGate units, dwarfing the 2023 refresh. Later during the call when referring to the slide, Defendant Jensen stated, "[y]ou can take the units that are up there, call it 650,000 units."

72. Also during the Analyst Day, Defendant Ohlgart discussed the size of the refresh compared to prior refresh cycles. She stated:

> Why is it such a steep increase? First of all, it's 11 models and these were high volume models. [S]econd[,] Fortinet has grown over time. So[,] you would expect that with high volume models coming end of support, the number is growing. [T]o put it into perspective[,] [t]he 2026 cohort is about a fourth of all the registered devices, FortiGate devices that we currently have.

73. A Deutsche Bank AG analyst asked Fortinet to discuss how much revenue the refresh would bring to the Company. Specifically, he stated and asked:

> I wanted to talk about that refresh slide. So very, very helpful disclosure. I'm curious to understand would it look much different on a dollar basis as opposed to looking at units. And when we think about your midterm guidance, how does the yield that you're assuming on that refresh opportunity compared to prior refresh opportunities that you've seen. Is there an argument that yield can actually be greater because you've got a much broader, more compelling converged offering today to go cross-sell and upsell than maybe you had . . . in the past.

74. Defendant Ohlgart responded:

> The yield is probably around net to [Fortinet] over the next two years, around $400 million to $450 million in product revenue, if with normal churn and an average price. So that's – if you put it into perspective to the total revenue, and it refreshes over two years [it] is definitely helping product revenue. Total revenue is probably up 4% . . .

> From a billings perspective, it's a billings event. It gives us the ability to sell more attached services and have a discussion with the customer about all the other products that may help them.

> So I think it's a compelling event for us to go out to the customers.

75. On December 11, 2024, Defendants Jensen and Michael Xie participated in a Barclays Global Technology Conference. During the conference, Defendant Jensen represented that the company had conducted a rigorous analysis of the refresh cycle. He stated:

> As we sat down for the Analyst Day, the 2025 planning session, we were looking

at some of our data and Christiane, again, thank you very much for that. What we really saw was something unusual, which is this cohort of refreshes in 2026. And more specifically, it's products that we announced in 2021 that we're going to go end of service in 2026. We've done some math on that. We look at the unit count, we provided that number, 650,000 units.

And then as we converted units to dollars internally in some of our commentary, we took certain haircuts. We look at those units that are no longer pinging home, as I would call, and we excluded those is part of that conversion. We made certain assumptions around how much of that refresh has already started for a variety of reasons and how much churn we have.

And then we quietly uttered a number of $400 million to $450 million for the 2026 cohort. I would encourage everybody in the audience to do your own math.

76.     Also during the call, Barclays Capital Inc. analyst Saket Kalia asked Michael Xie, "as [a] founder of the business, I mean, you've seen so many refresh cycles.  What's different about this refresh cycle just from your perspective?"  In response, Michael Xie stated, "a refresh happens as naturally it needs to occur.  And then -- but at some point, it happens in the bulk [more] than some other times."  He then indicated that customers are motivated to refresh by Fortinet's "unique technology" because it would "both increase the coverage [of network threats] as well as keeping up [with] the speed needs for the customer."

77.     On February 6, 2025, Fortinet reported 4Q 2024 financial results and held an earnings conference call to discuss the results.  During the call, Defendants told investors that Fortinet was beginning to see the benefits of customers refreshing their products and that the benefits would increase as the refresh cycle continued.  For instance, Defendant Jensen told investors, "[i]n the fourth quarter, we saw early upgrade movement with large enterprises, both on buying plans and actual purchases.  We expect the momentum to build as we move into the second half of 2025 as we get closer to the 2026 [end of] service dates." Defendant Jensen also touted "significant growth in product revenue" and stated, "when you peel back on that onion, you start to see enterprise companies have actually started their purchasing of the refreshes that we talked about at the Analyst Day."

78.     During the scripted portion of the February 6, 2025 call, Defendant Jensen further emphasized that the refresh cycle would benefit the Company as it unfolded through 2026 by

describing the initiatives Fortinet would carry out to maximize the refresh opportunity. He stated, "we're implementing several initiatives, including creating sales plays for each customer segment and key vertical; expanding our account plans for larger enterprises to more specifically target the upgrade and expansion opportunities; and collaborating with our channel partners on SMB [small and medium business] opportunities, incentive programs, end user data, and developing targeted bundle offerings for these customers."

79.    Also on the February 6, 2025 call, Oppenheimer & Co. analyst Ittai Kidron asked about the impact of the refresh cycle:

> If you know the devices and you can ping them and you know exactly where they are and when they get retired for the vast majority, can you just be a little bit more specific on what was the contribution of this upgrade to revenue this past quarter? And what is the exact dollar contribution you expect from the upgrade in your '25 guide?

80.    In response, Defendant Jensen did not directly answer the question. Instead, he discussed how Fortinet was working to identify all the units that needed an upgrade, indicating that there was still significant work to be done for Fortinet to maximize the refresh opportunity, and that the Company would improve its ability to identify and upgrade eligible customers as the refresh cycle continued:

> Yes. I think -- it's a great question. And keep in mind the two-tier distribution model. We sell to distributors to sell to resell to sell to end users. And oftentimes, it's also SMB.
>
> The quality of the data about the end user gets better and better, the closer you get to the end user, which would be every seller. And that's why you heard a reference in the script about the importance of working with them on data gathering.
>
> There's a bit of an honor system when they registered the devices. It may be more intuitive to us that, of course, we get a device register like our phone or something like that, but that's not what happens in practice, particularly in the SMB. And really, there's a heavy reliance there on the channel to spend time and energy if you want to get good reporting and tracking on that. So we'll get better at it as we go, and that's probably working closer with the channel partners.
>
> It is easier with the enterprises because we can talk to our sales rep [who] is working in a large enterprise and understand the account plans and what they're seeing, but you're still only getting a partial set of information[.] I think the reporting and the information will get more mature as we go along. It's moving pretty quickly right

now on us in terms of how we're developing it.

81.    On February 21, 2025, Fortinet filed its Annual Report for 2024 on Form 10-K with the SEC.  The 10-K was signed by Defendants Ken Xie, Jensen, and Ohlgart.  The 10-K contained the following language: "As organizations continue to modernize their cybersecurity infrastructure, we anticipate a significant firewall refresh and upgrade cycle in the coming years. Given our platform approach, this refresh presents a strategic opportunity to expand our footprint within existing customer environments."

82.    The February 21, 2025 10-K also contained a list of purported "Risks Related to Our Business and Financial Position," which included "the purchasing practices and budgeting cycles of our channel partners and end-customers, including the effect of the end of product lifecycles, refresh cycles or price decreases" and "execution risk associated with our efforts to capture opportunities related to our identified growth drivers, such as . . . product refresh cycles."

83.    On March 4, 2025, Defendants Ken Xie and Jensen participated in a Morgan Stanley Technology, Media & Telecom Conference.  During the conference, Morgan Stanley analyst Keith Weiss ("Weiss") asked, "any help you can give us in terms of helping to sort of model investor expectations on how this [refresh] is going to flow through your product revenues when we think about 2025 versus 2026, just to make sure that we stay appropriately conservative, if you will?"

84.    In response, Defendant Jensen represented that the refresh would be staggered through 2026 because larger customers would methodically upgrade in 2025 and 2026, while smaller customers were likely to wait until closer to the EOS deadline in 2026 to upgrade.  He stated, in part:

> [W]e look at our customer base, our customer types and what our expectations are about when they're likely to start on this upgrade journey. When you look at a larger enterprise that has a more sophisticated IT organization and a more sophisticated purchasing organization and security organization, then say in SMB and they're larger upgrade cycles we believe and we saw some indications of this in the fourth quarter that those larger enterprises will purchase and go through the upgrade cycle in a more methodical basis.
>
> It's simply too many units to take down all at once. And so while we got some

tailwinds, we think, from the fourth quarter on some of our larger firewalls, we would expect those larger enterprises to continue that purchasing pattern as we get closer and closer to the end of service date. If you look at the SMBs, it's quite possible that they're more likely to wait until Sunday night to do their homework, shall we say, they may wait until closer and closer to the end of service date before they actually go through that change. And that cohort, that sub cohort could be more of a [20]26 event. You probably have another group of customers or some place in between with the service providers, which oftentimes are selling to the SMBs. But again, they're more sophisticated in their buying behaviors, their security considerations. And they're more apt to start that planning and purchasing processing process earlier than the SMBs.

85.    Also on the March 4, 2025 call, Weiss asked about the magnitude of the refresh cycle and whether the refresh would allow Fortinet to cross-sell products and services as customers refreshed their FortiGates.  Specifically, Weiss stated and asked:

I think one of the things investors are excited about is a product refresh coming up within your firewall base. I think you've talked about an unusually large kind of percentage of that base seeing end of life over the next year or so. Can you talk to us about the magnitude of that opportunity? And does that -- is that just a product revenue? Is that just a firewall opportunity? Or does that give you sort of more potential to go in and sell [your] broader solution?

86.    In response, Defendants Jensen and Ken Xie represented that the scale of the refresh cycle, technological advances, and the dramatic evolution of customer security needs would drive cross-selling opportunities, as customers would pursue broader upgrades rather than simply replacing their old "box."  Specifically, Defendant Jensen responded:

Yes. And I think what really to your last comment, we're calling it the upgrade cycle, and they really -- and we'll come back to it, but that really is the opportunity to sell the full suite of products that we have . . .

We have an unusually large volume of units that are going end of support in 2026. It's roughly 10x more than our average in the prior 10 years. And [its] followed in 2027 with another cohort that's about half that size. It's just unusual to see the grouping of that. I think it has some things to do with some decisions that we made five years ago or four years ago when we announced had the support related to new chips and some other supply chain considerations.

So it's really creating the opportunity. What we don't want it to be is a simple unit swap. I don't want to see something just upgrading from unit to unit.

87.    Defendant Ken Xie replied:

Yes. The customer on average has the box on hand almost 10 years [when it

reaches] end of the service. And then we do see the opportunity compared to 10 years ago when they bought the box. First, the speed and then the function has a huge difference, probably average about 10 to 20x better speed. And then on the function, probably also 2, 3x more function than the previous half. And also the customers starting to deploy the network security differently than 10 years ago. So before it's more like secure, whatever the infrastructure border, all these kind of things, now they have to expand in supporting work from home. They have to do internal like data center kind of eased traffic security there, internal segmentation. So we do see this as like we collaborate opportunity. So we do see the customer so far we work with always kind of come back with much bigger plan infrastructure to upgrade than the premium just replacing the old box.

88.     On May 7, 2025, Fortinet reported 1Q 2025 financial results and held a conference call to discuss the results.  During the call, Defendant Ohlgart stated: "Regarding the record firewall upgrade cycle that we've spoken about previously, we continue to expect the firewall upgrade to gain momentum in both purchasing and planning activities in the second half of 2025."

89.     Also on the call, Morgan Stanley analyst Weiss asked: "What gives you guys confidence that you're still going to be able to perform the stronger second half pickup" from the refresh?  In response, Defendant Ohlgart stated:

What gives us confidence? We have a number of products that have been released, the next generation. And our products provide, I think, significant improvement of total cost of ownership and security compared to what customers bought 8, 9, 10 years ago. And we see the activity going on, especially in the enterprise.

I think we mentioned in the -- in our prepared remarks that FortiGates grew faster than the rest of product revenue, which I think is a testament to the strength that we are seeing.

90.     The statements above were materially false and/or misleading. In truth, Defendants knew that the refresh cycle would never be as lucrative as they represented, nor could it, because it consisted of old products that were a "small percentage" of the Company's business.  Moreover, Defendants misrepresented and concealed that they did not have a clear picture of the true number of FortiGate firewalls that could be upgraded.  While telling investors that the refresh would gain momentum over the course of two years, Fortinet misrepresented and concealed that it had aggressively pushed through roughly half of the refresh in a period of months, by the end of 2Q 2025.

*The Truth is Revealed*

91.    On August 6, 2025, after market hours, Fortinet released its 2Q 2025 financial results and held an earnings conference call to discuss the results.  During the call, Defendant Ohlgart revealed that: "We estimate that we are approximately 40% to 50% of the way through the 2026 upgrade cycle at the end of the second quarter based on the remaining active units and service contracts."

92.    Also during the call, Goldman Sachs analyst Gabriela Borges asked, in light of "your prepared remarks that we are 40% to 50% through the 2026 refresh cohort," that "2025 is a really big or larger than normal refresh cohort," and that the Company had a successful refresh in 2023, "why are we not seeing more upside in the numbers this year from the refresh cohort?"  Borges then suggested, "[i]s it possible that perhaps customers have excess capacity in their networks from a 2021 COVID-type elevated throughput environment?"  In response, Defendant Ohlgart indicated that Fortinet did not have a handle on how many of its smaller customers would refresh.  Specifically, she stated, that "where it's harder for us to predict" and where "we can only track registration rates and similar is in the lower end."  Defendant Ohlgart also agreed with Borges that "there could be some excess capacity from prior years that has been replaced or that is replacing some of the EOS models."

93.    Also in response to Borges's question, Defendant Ken Xie stated that the refresh involves very old firewalls, sold at a time when Fortinet's business was 5-10 times smaller, meaning that the total number of units eligible for upgrade was inherently limited.  Ken Xie also noted that the current refresh was not as successful as the 2023 refresh because the 2023 refresh consisted of products that were only four or five years old.  Specifically, he stated:

> Yeah. Also the -- the refresh upgrade of the product go out next year is the product[s that are] like 12 to 15 years after we introduced the product. It's not a product like four, five years [old] [during the 2023 refresh]. . . But if you compare [Fortinet now] to like a 10, 12, 15 years ago, the business size probably like current size is probably 5 times, maybe even 10 times larger. So that's where the operate refresh, we do see is very different than the [2023 refresh].
>
> It's a much older product. We really -- after we introduced a new product, they use

every selling maybe like seven, eight years. And then after we stop selling still supporting five additional year[s] for the service. After five additional year[s] stop shipping, but we do support service, then the customer reach to the end of service. So that's early probably average maybe like 12 to 15 years after the product being introduced.

So that's the sense we kind of try to help customers to upgrade. And so like I said, even we have a large number of products, but that's utilized the business we have like 12, 15 years ago.

94.     Later during the August 6, 2025 call, Defendant Ken Xie admitted that "[e]ven [if] all this product" available for the refresh upgraded "within like one or two years [it would] still not [provide] much business impact."  He added, "the business impact for the old device is also a much smaller percentage than the total business we have today" and described the refresh as "a pretty small percentage of our total business."

95.     On this news, Fortinet's common stock price dropped over 22%, from $96.58 per share on August 6, 2025 to $75.30 per share on August 7, 2025, on unusually high trading volume.

***Insider Sales***

96.     During the Relevant Period, while the Company's stock price was artificially inflated due to the false and misleading statements detailed herein, certain Individual Defendants sold Company stock while in possession of material, non-public Company information ("MNPI").

97.     Defendant Ken Xie sold more than 550,000 shares of Company stock while the Company's stock price was artificially inflated and while in possession of MNPI on December 17, 2024, January 15, 2025, March 10, 2025, May 2, 2025, and August 4, 2025 for proceeds in excess of $55 million.  The last sale was made two days before the end of the Relevant Period and yielded proceeds of more than $15,000,000.

98.     Defendant Michael Xie sold more than 800,000 shares of Company stock while the Company's stock price was artificially inflated and while in possession of MNPI on March 11, 2025, May 2, 2025, and August 4, 2025 for proceeds in excess of $79 million.  The last sale was made two days before the end of the Relevant Period and yielded proceeds of more than $46,000,000.

99.    Defendant Goldman sold 3,000 shares of Company stock while the Company's stock price was artificially inflated and while in possession of MNPI on March 10 and March 12, 2025 for proceeds of approximately $299,000.

100.    Defendant Jensen sold more than 80,000 shares of Company stock while the Company's stock price was artificially inflated and while in possession of MNPI on November 19, 2024, November 26, 2024, February 19, 2025, and February 26, 2025 for proceeds in excess of $6.5 million.

101.    These insider sales were suspicious in light of, among other things, the timing, amount, and the individual's buy/sell history.

***Repurchase of Company Stock***

102.    In breach of their fiduciary duties to Fortinet, and in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, the Individual Defendants caused or approved of the Company's repurchase of at least 4.6 million shares of its stock at artificially inflated prices.

103.    In October 2024, the Board approved a $1.0 billion increase in the authorized stock repurchase amount under the Company's Repurchase Program and extended the term of the Repurchase Program to February 28, 2026, bringing the aggregate amount authorized to be repurchased to $8.25 billion of outstanding common stock through February 28, 2026.

104.    During the three and six months ended June 30, 2025, the Company repurchased 4.6 million shares of common stock under the Repurchase Program in open-market transactions, at a weighted-average price of $87.89 per share, for an aggregate purchase price of $401.1 million, which excludes a $0.8 million accrual related to the 1% excise tax imposed by the Inflation Reduction Act of 2022.

105.    On August 21, 2025, the Board: (i) authorized an increase of Fortinet's share repurchase program by $1 billion worth of shares of common stock for an aggregate authorized repurchase amount of up to $9.25 billion; and (ii) extended the share repurchase program from February 28, 2026 to February 28, 2027. As of August 21, 2025,

approximately $1.23 billion remained available under the existing program, including the $1 billion increase.

106.    For context, during the three and nine months ended September 30, 2024, before the Relevant Period, the Company repurchased less than 0.1 million shares of the Company's common stock under the Repurchase Program in open-market transactions, at a weighted-average price of $54.99 per share, for an aggregate purchase price of $0.6 million.

107.    Repurchasing company stock makes sense when the stock is undervalued with expectations that the stock will be valued higher in the future. In fact, a repurchase is a statement to the market that the Company's stock at its current price is undervalued. In such instances, the Company will receive a high internal rate of return on its purchases. At the same time the Board caused Fortinet to repurchase Company stock, multiple Individual Defendants and members of the Board sold their stock on insider information at inflated prices.

***Harm to the Company***

108.    As a direct and proximate result of the Individual Defendants' misconduct, Fortinet has lost and expended, and will lose and expend, millions of dollars.

109.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

110.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

111.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

112.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

113.    Fortinet is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

114.    Plaintiff is a current shareholder of Fortinet and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

115.    A pre-suit demand on the Board of Fortinet is futile and, therefore, excused. At the time this action was commenced, the eight-member Board was comprised of Defendants Ken Xie, Michael Xie, Goldman, Hsieh, Hu, Napolitano, Sim, and Stavridis (the "Director Defendants"), Accordingly, Plaintiff is only required to show that four Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

116.    As an initial matter, Defendants Ken Xie and Michael Xie are not disinterested or independent and are therefore incapable of considering a demand. In addition to serving as directors, Ken Xie and Michael Xie are Company founders and also serve as high-ranking Company employees. Thus, as conceded by the Company's proxy statements, these Defendants are non-independent directors. Furthermore, Defendants Ken Xie and Michael Xie are named as defendants, and therefore face significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

117.    Each of the Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

118.    Each of the Director Defendants approved and/or permitted the wrongs alleged

herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

119.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

120.    Defendants Goldman, Hsieh, and Hu serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

121.    Defendants Michael Xie, Hu, and Napolitano serve on the Company's Cybersecurity Committee (the "Cybersecurity Defendants") and, pursuant to the Cybersecurity Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, risks, controls and procedures concerning cybersecurity, product security, data privacy, and other information technology. At all relevant times, however, the Cybersecurity Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the foregoing. Therefore, the Cybersecurity Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties

to the Company, as that would expose them to substantial liability and threaten their livelihoods.

122.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

123.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

124.    Moreover, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

125.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

126.    Furthermore, Individual Defendants Ken Xie, Michael Xie, and Goldman received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein.  These Defendants sold Company stock at artificially inflated prices generating proceeds of approximately $100 million.

127.    The acts complained of herein constitute violations of fiduciary duties owed by

1    Fortinet's officers and directors, and these acts are incapable of ratification.

2        128.    Thus, for all of the reasons set forth above, the Director Defendants are unable to

3    consider a demand with disinterestedness and independence. Consequently, a demand upon the

4    Board is excused as futile.

5                                **COUNT I**

6    **Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act and
     Rule 10b-5 Promulgated Thereunder**

7        129.    Plaintiff incorporates by reference and realleges each and every allegation

8    contained above, as though fully set forth herein.

9        130.    During the period of wrongdoing, the Individual Defendants disseminated or

10   approved false or misleading statements about Fortinet, which they knew or recklessly

11   disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those

12   false or misleading statements and Defendants' course of conduct artificially inflated the price of

13   the Company's stock.

14       131.    While the price of the Company's common stock was inflated due to the false and

15   misleading statements made by the Individual Defendants, the Individual Defendants caused the

16   Company to repurchase shares of its own common stock at prices that were artificially inflated

17   due to defendants' false or misleading statements. The Director Defendants engaged in a scheme

18   to defraud Fortinet by causing the Company to repurchase at least 4.6 million shares of Fortinet

19   stock at artificially inflated prices.

20       132.    The Individual Defendants violated Section 10(b) of the Exchange Act and SEC

21   Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue

22   statements of material facts or omitted to state material facts necessary to make the statements

23   made, in light of the circumstances under which they were made, not misleading; and (iii) engaged

24   in acts, practices, and a course of business that operated as a fraud or deceit upon Fortinet in

25   connection with the Company's purchases of Fortinet's stock during the period of wrongdoing.

26       133.    The Individual Defendants, individually and collectively, directly and indirectly,

27   by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and

28

participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices, and artifices to defraud in connection with the purchase and sale of Fortinet stock, which were intended to, and did, deceive Fortinet and its stockholders.

134. The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all improper statements made during the period of wrongdoing, as alleged above.

135. As described above, the Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this complaint were either known to the Individual Defendants or were so obvious that Defendants should have been aware of them. Throughout the period of wrongdoing, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

136. The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock, both by the Company itself and by the Individual Defendants who made improper insider sales.

137. As a result of the Individual Defendants' misconduct, Fortinet has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

138. Fortinet would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

139. As a direct and proximate result of the Individual Defendants' wrongful conduct,

the Company suffered damages in connection with its purchases of Fortinet stock during the period of wrongdoing. By reason of such conduct, defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

140.    Plaintiff, on behalf Fortinet, has no adequate remedy at law.

**COUNT II**
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

143.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, and good faith.

144.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Individual Defendants knew that the refresh cycle would never be as lucrative as they represented, nor could it, because it consisted of old products that were a "small percentage" of the Company's business; (ii) the Individual Defendants did not have a clear picture of the true number of FortiGate firewalls that could be upgraded; (iii) the Individual Defendants had aggressively pushed through roughly half of the refresh in a period of months, by

34

the end of 2Q 2025 (iv) the Company failed to maintain adequate internal controls; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

146.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

147.    Moreover, in further breach of their fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

148.    The Individual Defendants who conducted improper insider sales breached their duty of loyalty by selling Fortinet stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was material, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which those Individual Defendants used for their own benefit when they sold Fortinet common stock.

149.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

150.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

151.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their

fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

152.    Plaintiff, on behalf of Fortinet, has no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants for Aiding and**
**Abetting Breach of Fiduciary Duty**

153.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

155.    Plaintiff, on behalf of Fortinet, has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants**
**For Unjust Enrichment**

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fortinet.

158.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Fortinet that were tied to the performance or artificially inflated valuation of Fortinet, or received compensation that was

1   unjust in light of the Individual Defendants' bad faith conduct.

2       159.    Plaintiff, as a shareholder and a representative of Fortinet, seeks restitution from

3   the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and

4   other compensation procured by the Individual Defendants due to their wrongful conduct and

5   breach of their fiduciary and contractual duties.

6       160.    Plaintiff, on behalf of Fortinet, has no adequate remedy at law.

7                                    **COUNT V**
                             **Against the Individual Defendants**
8                              **For Waste of Corporate Assets**

9       161.    Plaintiff incorporates by reference and realleges each and every allegation

10  contained above, as though fully set forth herein.

11      162.    The wrongful conduct alleged regarding the issuance of false and misleading

12  statements was continuous, connected, and on-going throughout the time period in issue.  It

13  resulted in continuous, connected, and ongoing harm to the Company.

14      163.    As a result of the misconduct described above, the Individual Defendants wasted

15  corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and

16  (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including

17  defending the Company and its officers against the Securities Class Action.

18      164.    As a result of the waste of corporate assets, the Individual Defendants are liable to

19  the Company.

20      165.    Plaintiff, on behalf Fortinet, has no adequate remedy at law.

21                              **PRAYER FOR RELIEF**

22      WHEREFORE, Plaintiff demands judgment as follows:

23      A.      Awarding money damages against all Individual Defendants, jointly and severally,

24  for all losses and damages suffered as a result of the acts and transactions complained of herein,

25  together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do

26  not participate therein or benefit thereby;

27      B.      Directing all Individual Defendants to account for all damages caused by them and

28
                                        37
                    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Directing Fortinet to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

      1.    a proposal to control insider selling;

      2.    a proposal to strengthen the Company's oversight of stock repurchases;

      3.    a proposal to strengthen Fortinet's oversight of its disclosure procedures;

      4.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

      5.    a provision to permit the stockholders of Fortinet to nominate at least three candidates for election to the Board;

E.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Dated: October 8, 2025                    **RIGRODSKY LAW, P.A.**

                                  By:    */s/ Gina M. Serra*
                                          Gina M. Serra (# 361172)
                                          1091 N. Palm Canyon Drive, Suite 9
                                          Palm Spring, CA 92262
                                          Telephone: (760) 406-8009
                                          Facsimile: (302) 654-7530
                                          Email: gms@rl-legal.com

                                          *Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT